# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


## CA 06-904


**ELIZABETH W. NAQUIN, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED**

**VERSUS**

**LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT,
CITY OF LAFAYETTE, AND
LAFAYETTE PUBLIC UTILITIES
AUTHORITY**

**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2006-2014
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**JOHN D. SAUNDERS
JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of John D. Saunders, Michael G. Sullivan, and Billy H. Ezell,
Judges.


**AFFIRMED IN PART, REVERSED IN PART
AND RENDERED.**


Patrick W. Pendley
Stan P. Baudin
Pendley Law Firm
24110 Eden Street
Plaquemine, Louisiana 70764
(225) 687-6396
Counsel for Plaintiff/Appellant:
Elizabeth W. Naquin

**Christopher D. Shows**
**Pierce & Shows, A.P.L.C.**
**601 St. Joseph Street**
**Baton Rouge, Louisiana 70808**
**(225) 388-9574**
**Counsel for Plaintiff/Appellant:**
**Elizabeth W. Naquin**

**Andre P. LaPlace**
**2762 Continental Drive, Suite 103**
**Baton Rouge, Louisiana 70808**
**(225) 924-6898**
**Counsel for Plaintiff/Appellant**
**Elizabeth W. Naquin**

**Patrick S. Ottinger**
**City-Parish Attorney**
**Post Office Box 4017-C**
**Lafayette, Louisiana 70502**
**(337) 291-7273**
**Counsel for Defendants/Appellees:**
**Lafayette City-Parish Consolidated Government,**
**City of Lafayette, and Lafayette Public Utilities**
**Authority**

**Michael D. Hebert**
**Milling, Benson, Woodward, L.L.C.**
**101 La Rue France, Suite 200**
**Lafayette, Louisiana 70508**
**(337) 232-3929**
**Counsel for Defendants/Appellees:**
**Lafayette City-Parish Consolidated Government,**
**City of Lafayette, and Lafayette Public Utilities**
**Authority**

**G. William Jarman**
**Gordon D. Polozola**
**Kean, Miller, Hawthorne, D'Armond,**
**McCowan & Jarman, L.L.P.**
**One American Place, 22nd Floor**
**Post Office Box 3513**
**Baton Rouge, Louisiana 70825**
**(225) 387-0999**
**Counsel for Defendants/Appellees:**
**Lafayette City-Parish Consolidated Government,**
**City of Lafayette, and Lafayette Public Utilities**
**Authority**

**SAUNDERS, J.**

We have granted expedited consideration of this appeal as mandated by La.R.S. 13:5128 of the Bond Validation Law, La.R.S 13:5121, *et seq*. The plaintiff-appellant, Lafayette resident, Elizabeth W. Naquin ("Naquin")[1], sought to enjoin the issuance of up to $125,000,000.00 in communications system revenue bonds to be issued pursuant to Bond Ordinance O-053-2006. The trial court denied her motion for judgment filed against the Lafayette City-Parish Consolidated Government ("LCG"), the City of Lafayette (the "City"), and the Lafayette Public Utilities Authority (the "LPUA") (hereinafter collectively referred to as the "defendants"), finding that the challenged Bond Ordinance does not violate the cross-subsidy prohibitions of the Local Government Fair Competition Act, La.R.S. 45:844.41-844.56 (the "Fair Competition Act"). The plaintiff seeks a reversal of this judgment and the trial court's rulings granting, in part, the defendants' motion to strike her supplemental memorandum in support of the motion for judgment on the basis of peremption and its ruling sustaining the defendants' exception of res judicata as to all issues asserted in her motion for judgment, except those challenging the amendments to the Ordinance. The plaintiff also seeks remand of this matter to the trial court and a re-institution of a stay of the motion for judgment hearing until she is able to exhaust her administrative remedies. The defendants have answered the appeal, asserting as error the trial court's ruling on its exception of prematurity for failure to exhaust administrative remedies, alleging that the trial court improperly expanded the exception and, further, sustained the exception without dismissing the plaintiff's premature claims.

For the reasons set forth below, we affirm in part, reverse in part, and render.

---

[1]Matthew B. Eastin, originally participated as a plaintiff in the trial court proceedings and in the lodging of this appeal; however, he has been voluntarily dismissed from the appeal.

## ISSUES

1. Was the plaintiff's supplemental memorandum in support of her motion for judgment perempted?

2. Did the trial court err in reconvening the motion for judgment hearing prior to the finality of administrative proceedings before the Lafayette Public Utilities Authority?

3. Did the trial court erroneously expand the defendants' exception of prematurity beyond its scope and err in failing to dismiss certain claims that were deemed to be prematurely before the court?

4. Did the trial court err in sustaining the defendants' Exception of Res Judicata?

5. Does Bond Ordinance O-053-2006 violate the cross-subsidy provisions of the Fair Competition Act by unlawfully permitting the use of residual revenues from the existing utilities system and prohibited loans from the City to repay bonds that are to be issued to fund the new communications system?

## FACTUAL BACKGROUND

The subject of this appeal is Bond Ordinance O-053-2006, the amended version of Bond Ordinance O-230-2005, which through a previous legal challenge, was found by this court to contain provisions that violated certain prohibitions and conditions legislatively mandated by the Fair Competition Act.[2]  The Bond Ordinance, in its original and current form, sets forth the scheme for the issuance of up to $125,000,000.00 in twenty-five year bonds to fund a government owned and operated, local communications network.  This communications network will offer telephone, cable television, high-speed internet access, and other unnamed information and communication services to residents of the City of Lafayette.  The voters approved the original bond proposition on July 16, 2005.

---

[2]*See Bellsouth Telecommunications, Inc., et al. v. City of Lafayette & Lafayette Pub. Util. Auth., et al.*, 05-1478, 05-1505 (La.App. 3 Cir. 1/5/06), 919 So.2d 844.

On March 21, 2006, after the decision rendered by this court in *Bellsouth*, 919 So.2d 844, the Lafayette City-Parish Council, jointly with the Lafayette Public Utilities Authority, amended, supplemented, and restated Bond Ordinance O-230-2005 as Bond Ordinance O-053-2006, under the authority granted to those bodies in Section 12.1 thereof to make curative changes. The preamble to the amended Ordinance states that the amendments were performed specifically to comply with that decision.

On April 21, 2006, plaintiff, Naquin, who was an intervenor in the prior challenge to the 2005 Ordinance, filed a Motion for Judgment Pursuant to La.R.S. 13:5125[3], challenging the validity of the amended Ordinance, O-053-2006. The motion for judgment prayed that the 2006 Ordinance be deemed contrary to law and that the defendants be enjoined from issuing the bonds for multiple reasons.

The trial court set a May 22, 2006, hearing date on the motion for judgment, and ordered that the motion for judgment and scheduled hearing date and time be published twice in the Lafayette newspaper, the *Daily Advertiser,* in accordance with La.R.S. 13:5125. On the second publication date, May 9, 2006, the plaintiff filed a motion for leave of court to file a supplemental memorandum in support of her motion for judgment. On May 10, 2006, the defendants objected to the filing of that supplemental memorandum on the basis of peremption and filed a motion to strike it. Thereafter, on May 16, 2006, the defendants timely filed multiple exceptions and an answer to the motion for judgment.

At the May 22, 2006, hearing on the motion for judgment, the trial court heard a number of exceptions but did not reach its merits. First, the trial court addressed the defendants' motion to strike the plaintiff's supplemental memorandum. After

_____

[3]La.R.S. 13:5125 is the statute that sets forth the mandated procedure for contesting the issuance of governmental bonds.

3

argument, the court granted the motion, in part, stating that it was striking the supplemental memorandum to the extent it raised issues that had not been asserted in the motion for judgment.

The trial court next heard overlapping argument from the parties on the defendants' exceptions of res judicata, lis pendens, and prematurity for failure to exhaust administrative remedies. Regarding the exception of res judicata, the defendants argued that multiple claims asserted by the plaintiffs in the pending challenge to Bond Ordinance O-053-2006 were barred because those identical claims had been decided and were final, as evidenced by this court's opinion rendered in *Bellsouth*, 919 So.2d 844. Regarding the prematurity and lis pendens exceptions, the defendants argued that the plaintiff's motion for judgment asserted claims for a refund of excessive utility rate charges, even though the plaintiff had the identical claims pending before the LPUA. The defendants argued that any such utility rate claims were premature in the trial court because the LPUA was authorized by the local Home Rule Charter to decide such utility rate issues.

The court did not rule on the exception of res judicata, but it denied the exception of lis pendens and sustained the defendants' exception of prematurity for failure to exhaust administrative remedies, finding that Section 4-07 of LCG's Home Rule Charter gave the LPUA primary authority to decide the utility rate issues that were alleged in the motion for judgment. The trial court also found that the Home Rule Charter gave primary authority to the LPUA to hear challenges to bond issuances. The trial court stayed its hearing on the motion for judgment for twenty-one days to await rulings from the LPUA.

On May 25, 2006, the defendants filed motions to reconvene the hearing on the motion for judgment and its exceptions and to have the trial court reconsider part of

4

its prior ruling on the exception of prematurity. Defendants argued that the trial court sua sponte, and impermissibly, supplied its own exception of prematurity regarding the plaintiff's bond ordinance challenge and erroneously ruled that the bond ordinance challenge was to be decided by the LPUA. This, defendants argued, violated La.R.S. 13:5122 of the Bond Validation Law, which mandates that all challenges affecting the validity of governmental bonds are to be brought before the trial court. The trial court denied those motions when it reconvened the motion for judgment hearing on June 21, 2006, after the elapse of the twenty-one day period made available to the plaintiff to complete her proceedings before the LPUA.

At the onset of the June 21st hearing, the plaintiff advised the court that the proceedings before the LPUA were complete; however, she also advised the court that she intended to appeal the decisions of the LPUA to the trial court, in accordance with the Home Rule Charter's rules, once the LPUA's record was lodged with the clerk of the trial court. The court chose to proceed, and without taking further argument from council, commenced to rule on the defendants' exception of res judicata. The court sustained the exception and stated that the only issues in the motion for judgment that were not precluded were those that addressed the validity of the amendments to the 2005 Ordinance, as set forth in Bond Ordinance O-053-2006. After allowing argument on those issues, the trial court found that the amendments brought the Ordinance into compliance with this court's decision in *Bellsouth*, 919 So.2d 844, and denied the motion for judgment. The plaintiff filed this appeal.

## LAW AND DISCUSSION

### *The Supplemental Memorandum in Support of the Motion for Judgment*

The plaintiff assigns as error the trial court's partial grant of the motion to strike her supplemental memorandum in support of her motion for judgment. The trial court, in so ruling, accepted the defendants' assertions that the supplemental memorandum was perempted by the thirty-day time period set forth in La.Const. Art. 6, § 35(B), for the filing of challenges to bond ordinances and that the memorandum was an untimely attempt to assert new issues and to expand the scope of the motion for judgment. The trial court granted the motion to strike the supplemental memorandum, in part, orally ruling that it was striking only those portions therein that addressed issues that had not been previously asserted in the plaintiff's motion for judgment.

The plaintiff argues on appeal that the supplemental memorandum was not perempted. She claims that it addressed the same issues set forth in the motion for judgment and did not expand its scope in any manner. She contends that the trial court's ruling constitutes reversible error because she was prevented from presenting all of her arguments in opposition to the bond ordinance. Alternatively, she argues that the ruling should be reversed because the trial court ultimately allowed argument on the purportedly striken issues. We find no manifest error in the trial court's ruling.

The record shows that Bond Ordinance O-053-2006 was adopted by the Lafayette City-Parish Council and the LPUA on March 21, 2006 and was published on March 24, 2006 in the Lafayette *Daily Advertiser*. The plaintiff filed her motion for judgment and memorandum in support thereof challenging the Ordinance on April 21, 2006. According to La.Const. Art. 6, § 35(B), a motion for judgment challenging a bond ordinance must be filed within thirty days of its publication date.[4] Section

---

[4]Revised Statutes La.R.S. 13:5125 states:

35(B) sets forth a thirty-day peremptive period within which any challenges to governmental bond issuances must be brought. *See Cent. La. Bank & Trust. Co. v. Avoyelles Parish Police Jury*, 493 So.2d 1249 (La.App. 3 Cir. 1986). Section 35(B) of Article 6 of the Louisiana Constitution specifically states:

> (B)    Contesting Ordinance or Resolution; Time Limit. Every ordinance or resolution authorizing the issuance of bonds or other debt obligation by a political subdivision shall be published at least once in the official journal of the political subdivision or, if there is none, in a newspaper having general circulation therein. *For thirty days after the date of publication, any person in interest may contest the legality of the ordinance or resolution and of any provision therein made for the security and payment of the bonds. After that time, no one shall have any cause of action to test the regularity, formality, legality, or effectiveness of the ordinance or resolution, and provisions thereof for any cause whatever.* Thereafter it shall be conclusively presumed that every legal requirement for the issuance of the bonds or other debt obligation, including all things pertaining to the election, if any, at which the bonds or other debt obligation were authorized, has been complied with. No court shall have authority to inquire into any of these matters after the thirty days.

(Emphasis added). Because of the peremptive nature of this statute, it is clear that the

---

**§ 5125. Contesting issuance of bonds or action taken with respect to source of payment therefor; notice and hearing; service on member of governing body**

> Any person, corporation or association desiring to contest or enjoin the issuance of any such bonds or action taken providing for a new or different source of payment for outstanding bonds shall proceed by motion for judgment brought in the court having jurisdiction as provided in R.S. 13:5123. Upon the filing of any such motion for judgment, the court shall enter an order within five days following the publication of the motion in some newspaper published in or having general circulation in such governmental unit two times within a period of fifteen consecutive calendar days from the date of the issuance of the order specifying the dates for publication thereof, with the first publication as hereinabove provided to be not later than eight days from and after the date of the issuance of the order, and at the same time fix a time and place for hearing the proceeding, which time and place shall be published with the motion for judgment. The date fixed for the hearing shall be at least ten days, but not more than thirteen days, after the second publication of such motion for judgment. In addition to such publication, the plaintiff must secure personal service at least five days prior to the second publication of the motion for judgment on at least one member of the governing body of the governmental unit whose actions or proceedings are sought to be contested or enjoined.

7

right to make any legal challenges to the bond ordinance on any ground is extinguished upon the expiration of thirty days from the date the proposed ordinance is published. *See Lege v. Vermilion Parish Sch. Bd.*, 360 So.2d 664 (La.App. 3 Cir. 1978).

The record reflects that the plaintiff's motion for judgment and original memorandum in support thereof were filed within the time delay allowed by La.Const. Art. 6, § 35(B), and in accordance with the provisions of La.R.S. 13:5125. The plaintiff's supplemental memorandum was filed on May 8, 2006, two weeks after the peremptive period expired. However, because a memorandum filed in support of a motion is not a pleading, but rather is an assertion of argument and authority in support of the particular legal challenges or claims that have been properly asserted in a related pleading, we do not find that the peremptive period that governs the filing of the motion for judgment bars the filing of *legal memoranda* after the timely filing of a motion for judgment. The acceptance of such supplemental argument lies within the discretion of the trial court. To the extent the supplemental memorandum asserted challenges to the Bond Ordinance that were not included in the motion for judgment, those new assertions were, however, perempted. Consequently, we find no manifest error in the ruling of the trial court.

In response to the defendants' motion to strike the supplemental memorandum that has been filed on appeal with this court, we find that the supplemental memorandum, as striken, is properly before this court in the record, and deny the defendants' motion.

### *Exhaustion of Administrative Remedies*

We are next asked to consider whether the trial court prematurely reconvened the motion for judgment hearing prior to the plaintiff exhausting her administrative

8

remedies. The plaintiff argues that the motion for judgment hearing was reconvened by the trial court before she was allowed to appeal the decisions and findings rendered by the LPUA. As a result, she contends that the judgment of the trial court on the motion for judgment should be reversed and the matter remanded, pending exhaustion of the administrative hearing process. We decline to do so.

The record reflects that the trial court stayed the motion for judgment hearing, reasoning that the LCG's Home Rule Charter required the LPUA to first address the claims challenging utility rate charges and bond issuances. Specifically, the trial court relied upon Sections 4-07(H) and(I) of the Home Rule Charter[5] to find that the motion for judgment was premature and any hearing on it should be stayed. The trial court then ordered the LPUA to finalize its proceedings within twenty-one days of the date of its order, stating that after this time passed, it would reconvene the motion for judgment hearing to decide any remaining issues.

In answer to the question that is before us, we find that the trial court was not manifestly erroneous in reconvening the motion for judgment hearing on June 19, 2006, because only the trial court had authority to decide the issue of the bond ordinance's validity. Revised Statutes 13:5125 expressly mandates that all suits, actions, and proceedings of whatever nature affecting the validity of bonds of any governmental unit, are to be brought in accordance with Title 13, entitled "Courts and Judicial Procedure," by the filing of a motion for judgment in the district court in which the governmental unit seeking to issue those bonds is located. Section 5122 of

_____

[5]Sections 4-07 (H) and (I) state:

H.  The authority [LPUA] shall fix rates, incur indebtedness, approve the utility budget, and approve proposals for the improvement and extension of the utilities.

I.  A person residing in an area served by the utility department may appeal to the authority any proposed rate increases or issuance of bonds. The decision of the authority shall be final, subject to appeal to the appropriate courts.

Title 13 expressly states as well that "[t]hese provisions shall supersede all other acts and statutes on the subject and be controlling in all such cases notwithstanding the provisions of any other law or charter to the contrary . . . ." Consequently, the trial court had original jurisdiction over the bond challenge.

We do recognize that the trial court erred in directing the determination of the bond ordinance's validity to the LPUA. The trial court was correct, however, in recognizing that the LPUA possessed primary authority to hear the utility rate claims that had been also asserted in the motion for judgment. Consequently, those issues were prematurely before the trial court. Although the proper ruling on those premature claims should have been to dismiss them, without prejudice, in accordance with La.Code Civ.P. art. 423, we nevertheless find that the trial court's error in this regard was harmless. In addition, the record does not reflect that any of the LPUA's decisions were ever made a part of the trial court record or were considered by the trial court in reaching its decision on the merits of the bond challenge. Consequently, we find that the trial court's actions in directing the determination of the bond ordinance's validity to the LPUA, in this case, to have been harmless error that did not affect the lawful determination of this matter.

### *Res Judicata*

Plaintiff claims that the trial court committed reversible error in granting the defendants' exception of res judicata, asserting that the ruling prevented her from presenting all of her arguments and issues to the trial court for adjudication. We find that the trial court erred in sustaining the exception of res judicata because the doctrine is inapplicable to the facts of this case. "Res judicata is an issue and claim preclusion device which prohibits relitigation of matters which were litigated or could have been litigated in a prior suit." *Walker v. Howell*, 04-246, p.3 (La.App. 3 Cir. 12/15/04), 896

So.2d 110, 112 ; La.R.S. 13:4231; *see also*, La. Code Civ.P. art. 425. The 2006 Ordinance constitutes a new Ordinance which, pursuant to La.R.S. 13:5122, is wholly subject to challenge by any interested person via the procedures set forth in the Bond Validation Law. Although we have found that the trial court erred in granting the exception of res judicata, we, nevertheless, find this error to have been harmless as the result of the ruling did not serve to affect the adjudication of the issues that were properly before the trial court. *See State, through Dep't of Highways v. Mims*, 311 So.2d 914 (La.App. 3 Cir. 1975).

### *Does the "Credit Event" trigger prohibited cross-subsidization?*

The plaintiff argues that the trial court erred in ruling that the amended Bond Ordinance does not violate the Local Government Fair Competition Act's prohibition against cross-subsidization. She contends that the Ordinance allows the Communications System to unlawfully use Residual Revenues generated by the LCG's Utilities System, which have been pledged to secure the issued bonds, as a primary source of the payment of bond indebtedness without a "true default" occurring. The plaintiff challenges the legality of the "Credit Event" that opens the door for pledged resources to be accessed to pay for bonds. Although the 2006 Ordinance defines the "Credit Event" as an event of default, the plaintiff argues that the "Credit Event" occurrence is a self-declared event that occurs in anticipation of a default. This scheme, she argues, allows the Communications System to use funds other than those constituting its own generated "Net Revenues," as a primary source of satisfying bond payment obligations in violation of the Fair Competition Act. We agree.

According to the Local Government Fair Competition Act, a governing authority that chooses to engage in the business of providing telecommunications services, advanced services, and cable television services ("covered services") ***"may not cross-***

11

*subsidize its covered services with tax dollars, income from other local government or utility services, below-market rate loans from the local government or any other means."* La.R.S. 45:844.43(6); La.R.S. 45:844.53(2). To "cross-subsidize" means to "pay a cost included in the direct costs of or indirect costs of providing a covered service that is not accounted for in the full cost of accounting of providing the service, *other than the payment of start-up costs*." La.R.S. 45:844.43(7).

The Fair Competition Act does, however, allow local governments engaging in a telecommunications venture to finance the capital costs for facilities necessary to provide covered services through the issuance of bonds *"secured and paid for solely from the revenues generated by the local government from providing the covered services."* La.R.S. 45:844.52(C)(1). Section 45:844.52(C)(2) and (3) of the Fair Competition Act set forth the following additional restrictions regarding the payment of any bonds issued:

(2) A local government may not pay the origination, financing, or other carrying costs associated with one or more bonds issued under this Section from the general funds or other enterprise funds of the local government. Nothing in this Section shall preclude a local government from using the general funds or other enterprise funds to advance funds for the feasibility study prescribed under R.S. 45:844.49 or for start-up costs for the proposed venture, provided that any such funds advanced are repaid by the enterprise fund established under R.S. 45:844.51 at interest rates and on terms and conditions available to private enterprises in the open market.

(3) Nothing in this Chapter shall preclude a local government that owns and operates electric, water, gas, sewer and other utilities from pledging the resources of such utilities to obtain the best available interest rates, terms and conditions for the bonds necessary to finance the facilities used to provide the proposed covered services.

In sum, the Fair Competition Act expressly prohibits a local government from paying the costs associated with the issuance of any such bonds with money from its general fund or from the funds generated by its other enterprises. La.R.S. 45:844.52(C)(2). The local government is, however, allowed to use its general funds

or funds from one of its other enterprises to provide for the feasibility study required for a communications system venture or for start-up costs of the venture, as long as those funds are repaid to the local government from the communications system's enterprise fund at market rates. *Id.* The local government is also allowed under the Fair Competition Act to pledge the resources of its existing utilities to gain the best terms for the communications system bonds to be issued. La.R.S. 45:844.52(C)(3).

Now turning to the specific provisions of the 2006 Bond Ordinance that provide for the issuance of bonds to fund the LCG's communications system, it proposes to meet bond payment obligations in the following manner:

**ARTICLE IV**

SOURCE OF PAYMENT OF BONDS

SECTION 4.1. Bonds not to be Indebtedness of the Issuer. The Bonds shall not be or constitute general obligations or indebtedness of the Issuer within the meaning of the Constitution of Louisiana, but shall be payable first, from the net income and Revenues of the Communications System and second, to the amount necessary, from a secondary or subordinate pledge of the revenues of the Utilities System. . . .

We find, initially, that Section 4.1 complies with the Fair Competition Act's mandate that bonds issued are to be paid for with funds generated from the communications system enterprise. *See* La.R.S. 45:844.52(C)(1). The LCG's pledge of revenues from its existing Utilities System as security for the bonds is also permissible under the Fair Competition Act. *See id.*

In Section 4.2 of the Ordinance, the LCG explains that the bonds will be secured by a superior lien on the "Net Revenues"[6] of the Communications System and, secondarily, by "Residual Revenues"[7] of the Utilities System should there be

---

[6]"Net Revenues" is defined in Section 1.1 of the 2006 Bond Ordinance as "the amount of Revenues less the Cost of Operation and Maintenance of the Communications System."

[7]"Residual Revenues" is defined in Section 1.1 of the 2006 Bond Ordinance as "revenues from the Utilities System deposited in the Capital Additions Fund, established and maintained under the Utilities Bond Ordinance, and available for payment on Subordinated Indebtedness."

13

insufficient funds available in "Net Revenues" to meet bond obligations:

SECTION 4.2. Security for Bonds. The payment of the principal of, premium, if any, and interest on the Bonds shall be secured forthwith equally and ratably by an irrevocable lien on the Net Revenues, all in the manner and to the extent provided herein, prior and superior to all other liens or encumbrances on the Net Revenues, except as otherwise provided herein, and the Issuer does hereby irrevocably pledge and set aside the Net Revenues to the payment of the principal of, premium, if any, and interest on the Bonds and, upon the occurrence of a Credit Event, to the extent of the insufficiency, the Residual Revenues, before their use for any other purpose set forth in Section 5.1(e)(iv)(C) of the Utilities Bond Ordinance.[8]

As stated in *Bellsouth*, 919 So.2d 844, pledged resources are not seizable until there has been an event of default. The specific events of default provided for in the 2006 Ordinance are set forth in more detail in Article XI thereof, which states, in relevant part:

**ARTICLE XI**

EVENTS OF DEFAULT; REMEDIES

SECTION 11.1. Events of Default. Each of the following events is hereby declared an "event of default," that is to say if:

(a)     the occurrence of a Credit Event as described in Section 6.1(c) hereof; or

(b)     payment of principal and/or any installment of interest of any Obligations shall not be made when the same shall become due; either at maturity (whether by acceleration or otherwise) or on required payment dates by proceedings for redemption or otherwise; and any owed administrative fee shall not be made when the same shall become due and payable; . . . .

. . . .

Upon such a default as described in clause (a) or (b), the Issuer shall be required to pay any insufficiency from Residual Revenues without any judicial proceedings whatsoever, the necessity of such judicial proceedings being hereby expressly waived. In such case, the Issuer shall proceed to discontinue its provision of Covered Services, as soon as reasonably practicable, taking into consideration minimizing the disinterruption of services to the existing users of such Covered Services

_____

[8]The "Utilities Bond Ordinance" is defined by the 2006 Bond Ordinance in Section 1.1 thereof as the "General Utilities Revenue Bond Ordinance No. O-122-2004, adopted by the Governing Authority on June 29, 2004."

and the efficient wind down of the Communications System.

Section 11.1(b) of this Ordinance provides that if the communications division does not make *timely* payment on the bonds, the bonds are in default. It is at that point that pledged assets, categorized as "Residual Revenues" from other existing utilities, may be accessed to pay any bond obligations. Moreover, the Ordinance provides in this section that should this occur, the City must proceed to discontinue its provision of the communication's systems services, as soon as reasonably practicable. This provision, we find, does not invoke prohibited cross-subsidization, in that it does not provide for the use of revenues generated by other utilities of the local government as a primary source of paying the origination, financing or other carrying costs associated with the bonds issued. *See* La.RS. 844:52(C)(2). A true default occurs prior to using pledged resources to meet bond obligations and the City will discontinue its provision of the services being offered by the communications system because of its insolvency.

However, we do find that Section 11.1(a) improperly categorizes the occurrence of a "Credit Event," described in Section 6.1(c), as an event of default that allows access to Residual Revenues from the Utilities System to pay bond obligations. The "Credit Event," according to the Ordinance, occurs when the City fails to transfer an amount equal to the interest and principal due on the issued bonds from the Debt Service Account of the communications system enterprise fund, to the Paying Agent[9], by the 24th of the month *preceding the payment due date* (the interest payment dates are May 1 and November 1 of each year and the principal payment date is November 1 of each year, according to Section 1.1 of the Ordinance). We find that this "Credit Event" occurs in anticipation of a default and, as such, would allow prohibited access to resources generated by another division of the local government to serve as a primary

_____

[9]Section 6.1(c) of the Ordinance provides that the "Paying Agent" holds the interest and principal payments on bonds in trust for the benefit of the bondholders and disburses those payments on their due dates.

15

source of payment for the bonds. *See* La.R.S. 45:844.52(C)(1), (3). This is prohibited cross-subsidization.

***Does the Ordinance impermissibly allow the local government to provide loans to the communications system to pay for the bonds issued?***

Article V of the 2006 Ordinance states the following in regards to loans obtained by the communications system:

**ARTICLE V**

OTHER RIGHTS AND OBLIGATIONS OF THE
COMMUNICATIONS SYSTEM AND THE ISSUER

SECTION 5.1. Loans. The Communications System may obtain loans from any source (including the City) for purposes of providing Covered Services and for any other purpose consistent with Applicable Law. Said loans must be repaid and are subject to audit as required by Applicable Law.

SECTION 5.2. Special Obligations of the Utilities System. The Bonds are Subordinated Indebtedness. As such, the Residual Revenues of the Utilities System are hereby pledged as security for the payment of the principal of, premium, if any, and interest on the Bonds. . . .

As this court stated in the *Bellsouth*, 919 So.2d 844, decision, market-rate loans that are made by the local government, or other sources, to the communications system ***to provide covered services*** are not prohibited by the Fair Competition Act. *See* La.R.S. 45:844.53(2). The Fair Competition Act simply prohibits the use of "below-market rate loans" from the local government to provide any covered services. *See* La.R.S. 45:844.53(2). Regarding whether local government loans, under the Ordinance, are being improperly used as sources of payment of future bond obligations, we first must clarify that the "provision of covered services" contemplated by the Fair Competition Act does not include the "payment of bond obligations." Although the communications system may obtain market-rate loans from outside sources, as well as the local government, to provide covered services, or to advance funds for its required

16

feasibility study or its start-up costs, the Fair Competition Act does not permit the communications system to obtain loans from any sources to pay for bonds that have been issued. *See* La.R.S. 45:844.52(C)(2); La.R.S. 45:844.53(2). Only "revenues generated by the local government from providing the covered services" may be used to pay for bonds that have been issued. La.R.S. 45:844.52(C)(1).

In other words, the Fair Competition Act requires bond obligations to be satisfied with revenues generated by the communications system. Accordingly, as currently presented, Sections 5.1 and 5.2 simply provide for the communications system to obtain loans, in accordance with law, for the purpose of providing covered services and make no provision for obtaining loans for the purpose of paying bonds. Accordingly, we find no manifest error in the ruling of the trial court, finding that this portion of the Ordinance does not violate the cross-subsidy prohibition of the Fair Competition Act.

## CONCLUSION

The judgment of the trial court is, accordingly, affirmed in part, reversed in part, and rendered. The bond issuance pursuant to Bond Ordinance O-053-2006 is enjoined, pending compliance with this opinion. Costs of this appeal, in the amount of $3,009.95, are assessed equally to the parties. Plaintiff-appellant, Elizabeth W. Naquin, is ordered to pay one-half of the total appeal costs, and defendants-appellees, the Lafayette City-Parish Consolidated Government, the City of Lafayette, and the Lafayette Public Utilities Authority, are ordered to pay one-half of the total appeal costs.

**AFFIRMED IN PART, REVERSED IN PART**
**AND RENDERED.**

17